IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CAROLYN BLAKE BROWN <br><br> Plaintiff, <br><br> v. <br><br> FIRST COMMUNITY BANK <br><br> Defendant. | Civil Action No. 7:18CV00404 <br><br> **MEMORANDUM OPINION** <br><br> By: Hon. Glen E. Conrad <br> Senior United States District Judge |

Carolyn Blake Brown filed her Complaint against First Community Bank ("First Community") on August 17, 2018. Brown brings six claims in total. Counts I–IV allege racial discrimination in two failures to hire under Title VII of the Civil Rights Act of 1967, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("Section 1981"). Counts V–VI allege age discrimination in the same failures to hire under the Age Discrimination in Employment Act, 29 U.S.C. § 621 (the "ADEA"). First Community moved for summary judgment on Brown's claims, (ECF No. 33), and moved to exclude a supplemental report by Brown's statistical expert, Dr. Pamela Schlosser, as untimely, (ECF No. 40). First Community has since filed a motion to exclude Dr. Schlosser's opinions on substantive grounds. ECF No. 48. For the reasons stated, the court grants First Community's motion for summary judgment. ECF No. 33. In addition, the court denies First Community's original motion in limine, (ECF No. 40), on the merits, and denies the second motion in limine, (ECF No. 48), as moot.

## **Background**

First Community is a bank with branches located in several states, including several across Virginia. Compl. ¶ 5; Answer ¶ 5. Brown is an African American woman who was born in 1955.

Compl. ¶ 6; Answer ¶ 6. Brown alleges that race and age discrimination infected First Community's adverse employment decisions on two occasions: first, when First Community acquired the Radford branch where she worked (the "Swap") and second, when she later applied for the Branch Leader position at First Community's Radford branch. Compl. ¶¶ 15–16, 19–20.

### *The Swap*

In March 2016, First Community entered into two separate agreements (the "Swap Agreements") with another bank, First Bank. ECF No. 34-1 ("Hopkins Declaration"), Ex. 1 at 8–161. Under the Swap Agreements, the banks agreed to "swap" certain physical branches, which included First Bank's branch in Radford, Virginia. Id. The banks also exchanged "Records"—a defined term under the Swap Agreements—which did "not include . . . the personnel files and records relating to Branch Employees[.]" Id. at 98. The Swap closed on July 15, 2016. Id. at 105.

The Swap Agreements allowed the banks to choose which employees they would retain in the swapped bank branches. Id. at 144. The bank acquiring a given branch was to inform the selling bank which employees of that branch it intended to retain 30 days before the Swap Agreements closed. Id. The selling bank was responsible for managing, reassigning, relocating, or firing branch employees who the acquiring bank did not retain. Id. at 145.

### *Relevant Individuals*

Brown began her career in banking in 1976. In 2003, she joined a bank later acquired by First Bank. ECF No. 38-1 ("Brown Deposition") at 17:17–18:11. Brown eventually became the Branch Manager and Assistant Vice President of the bank's Dublin branch, and retained that title when First Bank acquired the branch in 2006. Id. at 21:5–20. In December 2014, First Bank closed its Dublin branch, and transferred Brown to its Radford branch. Id. at 30:11–19, 34:7–8. Brown did not retain her Branch Manager title when she transferred. Id. at 34:9–10. Brown

unsuccessfully applied for a Branch Manager position in First Bank's Wytheville branch in early 2015. Id. at 53:2–56:22. However, she became the Branch Manager and Vice President of First Bank's Radford branch in April 2015, and held that title until the Swap in July 2016. Id. at 62:6–13. First Community chose not to retain Brown as an employee after the Swap. Hopkins Decl. ¶ 9.

Jim Grubbs worked at First Bank's Radford branch until December 2015. ECF No. 38-2 ("Grubbs Deposition") at 8:14–17. During this time, Grubbs was an Executive Vice President and Brown's "direct supervisor" while she worked in First Bank's Dublin branch. Id. at 11:9–12:12. As her supervisor, Grubbs interviewed Brown when she applied for the Wytheville Branch Manager position in 2015. During that interview, Grubbs asked Brown for her age and when she planned to retire. Brown Deposition at 74:2–76:8. At the time of the Swap, Grubbs worked for First Community as a commercial lender, having moved there in December 2015. Grubbs Deposition at 8:3–13. Grubbs no longer works at First Community. Id. at 8:14–17.

Several First Community employees factor into the case as well. William Hopkins is a Regional President for First Community. Hopkins Decl. ¶ 2. Hopkins and Grubbs worked together to decide which First Bank employees to retain after the Swap, although Hopkins was the formal decisionmaker. Id. ¶¶ 4–10. Jessica Miller is a former First Bank employee retained by First Community after the Swap. ECF No. 34-5 ("Miller Declaration"), ¶¶ 2–3. Miller supervised Brown during part of the time they were both First Bank employees. Id. ¶ 8. After the Swap, Miller's duties included overseeing the Radford branch, and filling the Radford Branch Leader position after it was vacated in the Swap.[1] Id. ¶ 12. ReBecca Miles was a First Bank employee retained by First Community. ECF No. 38-5 ("Hopkins Deposition") at 38:16–19. Miles had

---

[1] The parties do not indicate any substantive difference between the roles of a Branch Manager at First Bank and a Branch Leader at First Community.

3

previously worked for First Bank at its Radford and Christiansburg branches. Miller Decl. ¶¶ 6, 9. After the Swap, Miles served as acting Branch Leader in Radford until First Community formally hired her for the position. Id. ¶ 10. Miles was 43 years old at the time. Hopkins Decl. Ex. 2. She served as Branch Leader until her death. Miller Decl. ¶ 16.

*The Hiring Decision at the Swap*

First Bank's employees before the Swap did not have to apply for First Community to consider retaining them. Grubbs Deposition at 23:6–16. First Community did not interview any First Bank employees when deciding whom to retain. Hopkins Deposition at 24:21–24.

First Community had limited information about the First Bank employees. Namely, First Community did not have access to any employee records, which were not exchanged under the Swap Agreements. Hopkins Decl. ¶¶ 5–6. As a result, First Community decided which First Bank employees to retain based on the information it had, which consisted primarily of statements from Grubbs. Grubbs' opinions carried some weight. He was a former First Bank employee then working for First Community, and he had personal knowledge of many First Bank employees, including Brown. Id. ¶ 5. Indeed, Hopkins asked for and relied on Grubbs' opinions when deciding which First Bank employees to retain. Id. ¶¶ 5–9; Grubbs Deposition at 72:22–73:7.

Hopkins decided not to retain Brown based on what Grubbs told him—Grubbs advised Hopkins that Brown had performance issues in loan production, profitability, and customer development. Hopkins Decl. ¶¶ 5–9. According to Grubbs, First Bank's Dublin branch failed to perform under Brown's management. Grubbs Deposition at 51:19–52:19. Specifically, the branch failed to generate loans under Brown. Id. at 53:1–12. Indeed, Grubbs had told Brown the branch needed to improve its numbers, particularly with respect to loans. Brown Deposition at 69:8–70:7. First Bank ultimately closed its Dublin branch "over the lack of income that it did not make."

4

Grubbs Deposition at 52:12–16. Grubbs blamed the branch's failure on Brown. Hopkins Deposition at 19:3–20:14; Hopkins Decl. ¶ 8. Grubbs told Hopkins all this when they decided which First Bank employees to retain. Hopkins Decl. ¶¶ 5–9. Grubbs also told Hopkins that the Radford branch began to sustain losses after Brown was transferred there, which Grubbs also blamed on Brown. Id. In order to increase the Radford branch's profitability, Grubbs began placing or "planting" loans in that branch. Id. ¶ 8; Brown Deposition at 84:5–17. Eventually, Miles was transferred to the Radford branch to help Brown develop and maintain customer relationships. Miller Decl. ¶ 9.

The evidence provides further context for Grubbs' opinions on Brown: context that First Community did not have when it made its hiring decisions. Miller had also expressed concerns about Brown's performance. Around April 2015, Miller became Brown's direct supervisor. Miller Deposition at 16:10–18; Miller Decl. ¶ 8. In Miller's 2016 performance evaluation of Brown, Miller told Brown that she needed to get more loans and work on the branch's numbers. Brown Deposition at 70:22–71:17.

Otherwise, it appears that Brown received favorable, or at least not negative, feedback during her time at First Bank. ECF Nos. 38-14, 38-15, 38-16, 38-18, 38-19, 38-22. Hopkins testified that in deciding whether to hire Brown, he "specifically" asked Grubbs whether Brown's "performance evaluations [would] prove or show that there was some issues in the past, and [Grubbs] said yes." Hopkins Deposition at 21:5–15. Hopkins agreed however, that Grubbs' statements were "not supported by the documentation"—namely, the performance evaluations. Id. at 22:10–15. Hopkins stated further that the fact that Brown's performance evaluations rated her as at least meeting expectations "would surprise me, because that is not what was indicated to me from Jim Grubbs." Id. at 22:1–9.

Ten of the seventeen Radford branch First Bank employees retained after the Swap were over the age of 40. Hopkins Decl. Ex. 2 at 162. Along with Brown, First Community declined to hire four or five white First Bank employees. Brown Deposition at 116:1–6.

### *Post-Swap Hiring Decision*

In mid-August 2016, First Community posted a job opening for the Radford Branch Leader position left vacant after the Swap. The posting listed several requirements including "[t]wo years of leadership/management experience within a bank branch." ECF No. 38-10. Brown and Miles, who was then acting Branch Leader, both applied for the opening. ECF Nos. 38-11, 38-9. Miles' application listed two years of experience as Assistant Branch Manager, beginning in April 2014. It also listed nearly ten years of experience as a "Customer Service Rep," describing Miles' duties as "handl[ing] all aspects of the branch," and "[taking] lead in customer appreciation days and events for the branch." ECF No. 38-9 at 2. In opposing summary judgment, Brown disputes whether Miles had two years of management experience, citing to an email suggesting that Miles was not promoted to Assistant Branch Manager until March 2015. ECF No. 38-12.

Grubbs and Miller decided which applicants to interview. Miller Decl. ¶ 14. First Community decided not to interview or hire Brown after the Swap because it had decided not to retain her only a few weeks earlier. Miller Deposition at 27:25–28:11. Miller and Grubbs interviewed Miles and hired her. Miller Decl. ¶¶ 14–15. Miller described Miles as "the best candidate" and qualified for the job. Id. Miller also stated that Miles had "proven herself capable of successfully running the branch" during her time as acting Branch Leader. Id.

Stated succinctly, Brown alleges that First Community's decisions not to retain her after the Swap and not to hire her for the Radford Branch Leader position were infected by race and age discrimination. First Community has moved for summary judgment on both sets of claims.

6

## Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted). In determining whether a genuine issue of material fact exists, the court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to . . . the nonmoving party." Id. at 565 n.1 (internal quotation marks omitted). However, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).

## Discussion

Title VII and Section 1981 both prohibit employers from not hiring a person for racially discriminatory reasons. 42 U.S.C. § 2000e–2(a)(1); 42 U.S.C. § 1981(a). Similarly, the ADEA creates a cause of action for certain employees over the age of 40 who allege age-based discrimination. 29 U.S.C § 623(a). If there is no direct evidence of race or age discrimination, a plaintiff can attempt to prove her claims by using the familiar McDonnell Douglas burden-shifting analysis. Laber v. Harvey, 438 F.3d 404, 430–33 (4th Cir. 2006). The plaintiff bears the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). After that, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for failing to hire her. Id. at 802–03. If the employer does so, the burden shifts back to the plaintiff to establish that the given reason is merely a pretext for unlawful

discrimination.  Id. at 804.  This requires proof of "but-for" causation for ADEA claims, which is a "fact-bound, case-specific" inquiry.  Westmoreland v. TWC Admin. LLC, 924 F.3d 718, 725–27 & n.2 (4th Cir. 2019).

**I.**     **Prima Face Case**

In terms of their legal framework and the operative facts, Brown's race and age discrimination claims are almost identical in most respects.  A prima facie case of a discriminatory failure to hire under both Title VII and Section 1981 has four elements.  A plaintiff must show "(1) [s]he is a member of a protected class; (2) [s]he applied for the position; (3) [s]he was qualified for the position; and (4) h[er] application was rejected under circumstances that give rise to an inference of unlawful discrimination."  Byers v. Alamance Cty., 633 F. App'x 135, 136 (4th Cir. 2016) (internal quotations and citation omitted) (Title VII); Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004) (same, Section 1981).  The elements of an ADEA claim are quite similar.  A plaintiff must show (1) that she was at least 40 years old; (2) the employer had an open position for which she applied and was qualified; (3) she was rejected despite her qualifications; and (4) the position remained open or was filled by a similarly qualified applicant who was substantially younger than the plaintiff.  Laber, 438 F.3d at 430.  The court assumes that Brown has made out a prima face case of race and age discrimination.  Brown is an African American woman over the age of 40, she met the minimal posted requirements of the Radford Branch Leader position, and she was hired by a white woman substantially younger than her.[2]

---

2     The court recognizes that Brown did not formally apply to be retained by First Community at the time of the Swap.  Given that First Community did not ask for applications nor conduct interviews for that position, the court will treat Brown "as if she had actually applied."  Giant Food Inc., 370 F.3d at 431.

8

## II. Legitimate, Non-Discriminatory Reason

The court concludes that First Community has satisfied its burden, as to both race and age discrimination, to state a legitimate, nondiscriminatory reason for not hiring Brown. "The employer's burden at this stage 'is one of production, not persuasion; it can involve no credibility assessment.'" Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 514 (4th Cir. 2006) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)). "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). First Community claims that it did not retain Brown after the Swap due to her purportedly poor performance regarding loans and profitability. ECF No. 34 at 17. Hopkins made this decision based solely on the information Grubbs provided him, and he did not have access to any information about Brown's age or ethnicity at the time. Hopkins Decl. ¶¶ 9–10. Brown does not dispute that her prior performance <u>could be</u> a legitimate non-discriminatory reason for not hiring her. Instead, she attacks First Community's justification as pretextual.

## III. Pretext

To show pretext, a plaintiff must "prove *both* that" the employer's stated reason for not hiring her "was false, *and* that discrimination was the real reason." Adams v. Trs. of the Univ. of N.C.–Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (internal citation and quotation marks omitted) (emphasis in original). A plaintiff "can prove pretext by showing that [s]he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." Heiko v. Colombo Sav. Bank, 434 F.3d 249, 259 (4th Cir. 2006). "It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Evans, 80 F.3d at 960–61 (quotation marks omitted). Courts ruling on pretext should consider "a

9

number of factors" including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 146–49 (2000).

Brown has not created a material dispute of fact as to the falsity of First Community's stated reason for not hiring her. To begin, Brown's own deposition testimony corroborates what Grubbs told Hopkins: that Brown struggled to maintain profitability when she managed First Bank's branches. Brown testified at her deposition that Grubbs had told her the Dublin branch "needed to work on our numbers," particularly with respect to "[l]oans." Brown Deposition at 69:8–70:7. Likewise, Brown testified that Miller told her she needed to "get more loans," and "work on our numbers" during Brown's 2016 evaluation. Id. at 70:22–71:17. Brown also testified that the Dublin branch "had to grow our loans because we didn't have any." Id. at 82:7–10. Further, Brown confirmed that Grubbs had been placing or "planting" loans in the branches under her control. Brown Deposition at 84:5–17; Hopkins Decl. ¶ 8.

In addition, Brown's written performance evaluations, in which both Grubbs and Miller rated her a passing three out of five for "delivering results" and "developing high performing teams," fail to rebut the evidence that Brown had a history of needing to work on her loan numbers and profitability. See e.g., ECF No. 38-15 ("In 2015, we look for Carolyn to . . . maintain both loan and deposit relationships as well as reach out to new First Bank customers."). The same is true for the emails Brown received, which gave her vague and general praise, and did not address specific metrics of job performance Grubbs highlighted. See Coleman v. Schneider Elec. USA, Inc., 755 F. App'x 247, 249 (4th Cir. 2019) (concluding that the fact that a former supervisor believed that the plaintiff performed her training tasks adequately was insufficient to establish pretext and emphasizing that "the hiring manager was entitled to form a different opinion");

Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269 (4th Cir. 2005) (recognizing that courts "cannot require that different supervisors within the same organization must reach the same conclusion on an employee's qualifications and abilities"). Finally, Hopkins' testimony at his deposition, that Brown's performance evaluations were more positive than Grubbs made them sound, fails to create a material dispute of fact in light of Grubbs' consistent and repeated evaluations of Brown's performance regarding loans and profitability. See Evans, 80 F.3d at 960–61 ("It is the perception of the decision maker which is relevant . . . .").

Moreover, after considering the parties' arguments, the evidence, and the applicable law, the court can discern no competent direct or circumstantial evidence on which a reasonable jury could find that age was the "but-for" reason Brown was not hired, even if a reasonable jury could find that First Community's stated reason was false. A plaintiff may not prove discriminatory intent by pointing only to "stray remarks," which "lack a nexus connecting them to" the relevant adverse employment decision. See Rayyan v. Virginia Dep't of Transportation, 719 F. App'x 198, 202 (4th Cir. 2018); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511–12 (4th Cir. 1994) (single comment that "there comes a time when we have to make way for younger people," made two years before employment decision, created no inference of age bias); see also Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) ("[G]eneral or ambiguous remarks referring to the process of generational change create no triable issue of age discrimination."). "Also, when evaluating alleged age animus, [courts] must consider the context in which statements were made." Merish, 359 F.3d at 336.

Here, during her deposition, Brown testified that Grubbs asked about her age and retirement plans at a job interview in early 2015, more than a year before the Swap.[3] Brown

---

[3] A jury could attribute any bias on Grubbs' part to First Community under a "cat's paw" theory. In evaluating an employer's liability for discrimination by its employees, courts must look to "the general common law of

11

Deposition at 74:2–76:8. Importantly, however, Brown was promoted to Branch Manager in Radford soon <u>after</u> these comments, and Brown points to no other evidence linking Grubbs' questions to the decision not to retain her after the Swap. See Merish, 359 F.3d at 336 (finding no age animus when viewing comments in the context of other employment decisions). Under these circumstances, no reasonable jury could find that age discrimination played any part in the decisions not to hire Brown. See Rayyan, 719 F. App'x at 203 (holding that "two distasteful comments" of an "isolated nature" made roughly twenty months and five months before firing were not enough to show race was a motivating factor in termination). This is especially true where uncontradicted record evidence shows that Brown had loan-related performance issues. Id. (noting that plaintiff had been reprimanded both before and after comments). Finally, uncontroverted evidence shows that several of the employees retained at the Swap were above the age of 40. Hopkins Decl. Ex. 2 at 162. Such evidence belies any claim that First Community was targeting older First Bank employees. See Merish, 359 F.3d at 338 (retention of other workers above 40 indicated lack of animus). As a result, the court grants summary judgment on Brown's age discrimination claims.

Similarly, again assuming that a jury could find that First Community's stated justification for its employment decision was false, the court believes that no reasonable jury could find First Community's proffered reason to be a pretext for race discrimination. The mere fact that Brown was the sole African American under Grubbs' supervision while Grubbs was her superior is not probative of racial bias. Neither is the fact that Brown recommended an African American for a

---

agency." See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754 (1998). Here, Grubbs relayed information on Brown's job performance, not her age or race, to Hopkins. Hopkins Decl. ¶¶ 5–11. Both parties recognize that Hopkins "relied on" Grubbs' recommendation regarding Brown and decided not to hire her "based on" what Grubbs said. Id. Importantly, Grubbs provided this information because Hopkins asked for it. Grubbs Deposition at 72:22–73:7 ("Bill Hopkins would ask me about everybody, just like Carolyn Brown."). Any bias by Grubbs could also be attributed to First Community for post-Swap hiring as well. Grubbs took part in deciding which applicants to interview and reviewed Brown's application. Miller Decl. ¶¶ 12, 14.

job that Grubbs gave to a white person—Brown acknowledged during her deposition that she had no knowledge of why Grubbs made that hiring decision, when it occurred, or what the candidates' relative qualifications were. Brown Deposition 71:18–74:1, 76:13–18.

Likewise, Brown has not created a dispute of fact as to Miles' qualifications, and thus the fact that Miles was white is not probative of racial animus. "Courts do not sit as super personnel departments second guessing an employer's perceptions of an employee's qualifications." Malghan v. Evans, 118 F. App'x 731, 733 (4th Cir. 2004). First Community has provided undisputed evidence that Miles had two years of leadership or management experience as the job posting required. A plaintiff "cannot establish her own criteria for judging her qualifications" for a job, rather "[s]he must compete . . . based on the qualifications established by [the] employer." Anderson, 406 F.3d at 269. Therefore, the fact that Brown "also was well-qualified for the position does not establish discrimination" by First Community "in its selection of another well-qualified individual for the position for which [she] applied." Malghan, 118 F. App'x at 733.

The court ends by addressing Dr. Schlosser's statistical evidence, which Brown offered to show racial discrimination and pretext. The court does not agree that Dr. Schlosser's opinions are relevant to showing racially discriminatory intent for purposes of Brown's claims. The United States Court of Appeals for the Fourth Circuit has held that "[s]tatistics can provide important proof of employment discrimination," both as part of a prima facie case and in showing pretext. Carter v. Ball, 33 F.3d 450, 456 (4th Cir. 1994). Courts may, however, exclude statistical evidence "with little or no probative value." Id. Moreover, "[s]tatistics alone are not sufficient to prove pretext in individual disparate treatment cases" and "an employer's overall employment statistics will have little direct bearing on the specific intention of the employer when making a particular adverse employment decision." Bostron v. Apfel, 104 F. Supp. 2d 548, 554–55 (D. Md. 2000),

13

aff'd, 2 F. App'x 235 (4th Cir. 2001); Luqmaan v. Volvo Grp. N. Am., LLC, 94 F. Supp. 3d 762, 771 (W.D. Va. 2015) (Conrad, J.) (statistical evidence purporting to show disparate treatment could not show that the "particular reassignment" at issue "formed part of that pattern"). Dr. Schlosser's opinions, addressing aggregate data, have little to no relevance to Grubbs', Hopkins', or Miller's personal intentions.

Moreover, the court is not convinced that Dr. Schlosser's opinions create a relevant "apples to apples" comparison, even if they were probative of any individual's state of mind. "In a case of discrimination in hiring or promoting, the relevant comparison is between the percentage of minority employees and the percentage of potential minority applicants in the qualified labor pool." Ball, 33 F.3d at 456; Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308 (1977) (relevant comparison was the "qualified public school teacher population in the relevant labor market"). Dr. Schlosser does not provide conclusions on a city by city level. ECF No. 38-25, Schlosser Decl. ¶ 6 ("[I]t is impossible to narrow the location more narrowly than Virginia"). Nor does Dr. Schlosser provide a position by position analysis. The Commonwealth of Virginia is diverse, as are its cities, and workers inside a bank perform a broad spectrum of tasks. Indeed, Dr. Schlosser's data shows that jobs within First Community ranged in seniority from "Branch Leader" to "Intern," and varied widely, from "Help Desk Technician" to "Associate Counsel" to "Financial Assistant – Part time." See ECF No. 38-24 at 33–102. Further, U.S. Census data shows that the qualified labor pool for a high-level position like Branch Leader in a city like Richmond could be dramatically different from the pool for IT staff or part-time workers in Abingdon.[4] Yet Dr.

---

[4] U.S. Census data shows substantial differences between the overall population and racial composition between these two areas, as well as notable differences in educational attainment. See Abingdon town and Richmond city QuickFacts, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/abingdontownvirginia, richmondcityvirginiacounty/PST045218. Under Federal Rule of Evidence 201, the court may take judicial notice of U.S. Census data. See Hollinger v. Home State Mut. Ins. Co., 654 F.3d 564, 571–72 (5th Cir.2011) ("United States census data is an appropriate and frequent subject of judicial notice.").

Schlosser groups all these populations together.  Dr. Schlosser's opinions, therefore, do not analyze an appropriate labor pool and do not aid in determining whether racial bias factored into the decision not to hire Brown as Branch Leader in Radford.  Fed. R. Evid. 702.

The court thus concludes that no reasonable jury could find that racial bias was the real reason that First Community did not hire Brown, based on the evidence submitted.  See Ramos v. Molina Healthcare, Inc., 603 F. App'x 173, 178 (4th Cir. 2015) (affirming summary judgment where plaintiff "failed to supply any connection" between allegations of discrimination and employment decision, and any inferences in his favor were "unwarranted, given the complete lack of factual support in the record that his supervisors considered his race or national origin" when firing him); Jiminez v. Mary Washington Coll., 57 F.3d 369, 378–83 (4th Cir. 1995) (evidence that was "insubstantial" and required speculation, which showed "no nexus between the challenged conduct and the adverse action," could not support Title VII claim).  The court grants summary judgment on Brown's racial discrimination claims.

## **Conclusion**

For the reasons stated, the court grants First Community's motion for summary judgment.  In sum, Brown has failed to provide evidence from which a reasonable jury could find that First Community's stated reason for not hiring her was pretext for either race or age discrimination.

The court also denies First Community's motion to exclude Dr. Schlosser's supplemental opinions as untimely.  ECF No. 40.  First Community agreed to take Dr. Schlosser's deposition out of time, and her supplement followed only five days later.  Further, Dr. Schlosser's supplemental report was similar enough to her original opinions to constitute a true supplement.  Finally, in light of the foregoing opinion, the court denies First Community's motion to exclude Dr. Schlosser's opinions on substantive grounds, (ECF No. 48), as moot, because the court has

concluded that Dr. Schlosser's opinions are not relevant to Brown's claims.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 23rd day of October, 2019

_____
Senior United States District Judge